with Sacred Heart. We will now hear case number two for this morning, United States v. Moshiri. Mr. Clovelly. Thank you so much, Your Honors. Dr. Moshiri worked his way through medical school and then when he graduated in the late 90s, he basically hung a shingle. Since we're all lawyers, I feel we can all know that we're very proud when we go off on our own and we have a successful career for over 20 years before he was solicited by Sacred Heart Hospital because their podiatric residency program was in serious trouble and it had three bad, critical inspections in a row by the Committee for Podiatric Medical Education and they needed somebody who could bring their patients to Sacred Heart. Something most of the podiatrists who were attending, including the residency director, could not do. Someone to bring their patients to Sacred Heart. You cannot lose sight of the fact that it was in a very bad part of the city. Now, there's references in the record that Mr. Nagelvert, when he came in, he improved the physical plant greatly and my client liked going there and he says it in a recording. I like being here, he says, right on a recording. But what happened was, and frankly, I'm going to ask you to examine Judge Cannelli's 16-page opinion because most of it is favorable. Well, he quits on two of the counts. It's just the third one. Yes, and I want to speak to that directly because what happened was, if you look on page five of his opinion, he points out there's no evidence that Dr. Moshiri ever solicited payments. They offered him this contract to teach. But what do we do? I mean, there are a couple of things that bother me about this. So I'd like your comments. There is this interview, right, with the agent in which he says he's reported to have said some incriminating things about this last... I definitely want to talk about that. May I put it in context? Certainly. What happened was they knew they had no evidence. He had been, for five years, operating lawfully with a clean frame of mind, in good faith. And then Mr. Poirot comes to him lying, altering the terms of the contract, which does not require any specific number of patients, no number of hours, no volume, and says, I want a list of patients. Mr. Novak is not happy with your performance. This is where the Taj Mahal comment comes in. Well, there's two conversations, one in February and one in March. Well, the Taj Mahal comment comes back when Mr. Poirot closes the trap. Because my client comes back in to get his March payment, and he says, well, what did Mr. Novak say? Well, in fact, as it's pointed out in the opinion, Mr. Novak said, who cares? I mean, they're podiatric surgeries, they're worth only a few hundred dollars. But the program was important to the hospital, very important. Well, that changes their Medicare billing. Exactly, there's a percentage, there's a percentage there. The program itself was important to the hospital, and they were about to lose it. So then my client gets mad. Oh, because Poirot says, well, what do you think he said? It was all negative. So my client gets mad and says, well, he wants the Taj Mahal. And then he says things which to me, see, it's your, where are you standing when you examine what he says? He says, I'm the most active podiatrist in this hospital. Well, the judge took that negatively, saying, well, he thinks he should get paid because he's the most active. It's right in his opinion. But in fact, he's just saying, well, I'm a hardworking guy. I'm doing what I'm supposed to do. I'm bringing my people here. And every single person he ever brought, there was a resident, and there were more than one on many occasions. For instance, when resident Kumar, then a doctor, testified, I showed him three or four surgical reports, which actually predated when he began his residency, because when he found out he was going to be a resident at Sacred Heart, he was interested, and he personally sat in on surgeries that my client did, along with medical students who sat in on surgeries. There's no credit, there's no record of it, because there's no credit with the PRR, but he actually did the operating report, even though he hadn't even began the program yet. And he admitted it. So my client did everything he could to teach these people, and he was always available, but the residency director had his favorite people. So I'm just going to say this. You don't need to talk about it right now, but one of the other things, this goes to one of your other arguments on appeal, is the amount of money that he's getting, because we do have the testimony that it's six times more than the most other people get. Your Honor, I would like to rely on my written argument, because, frankly, Dr. Petrov's opinion should never have gone in. There was no market survey. I think you've indicated in your prior comment, Chicago's a special market. Now, I apologize, because I promised I would talk about Agent Jamaros, and I stopped. Agent Jamaros, because I'm looking at page 14 of this transcript from Judge Connelly, and there he says, even before he gets to Agent Jamaros, he says, You take all of this together. These conversations show that the government has argued Dr. Mashiri himself associated his payments that he was getting, whatever, the $4,000 a month or what have you, two to four, with patient referrals at least as of February 2013. So Judge Connelly, this is why he quits in the first two, I guess is willing to say the government has failed to prove that that knowledge is there at the beginning, but that it comes along at some point. That's where I was going, and I sidetracked myself. I apologize. So only by changing the rules of the game, telling my client that we need to know more what you're doing, Mr. Novak is unhappy, and the agents said they never told Mr. Puerro to do that. He was not supposed to change, alter the contract. So then my client gets mad, and he says what he says. Well, Agent Jamaros admitted, I focused on the March meeting, and I kept on talking about the March meeting. And so my client writes this statement, which is not incriminating. He says, I was doing this for years, going along happily, and all of a sudden I'm told my services are not being appreciated. They're not satisfied with my work. And then the agent is suggesting, I'm saying to the court, I'm suggesting to the court, well, so, you know, it turned into pay for patience. And my client might have said, well, you know, I suppose you could look at it that way. I mean, you just don't know because it's not recorded, and to me it's not willful. It doesn't overcome his obvious showing of good faith. And then when you figure in that he never even took his April check, maybe the judge should have said, well, maybe he acknowledged it to himself that it was illegal, and so he didn't pick up his last stipend. And there's no evidence after March 8th. If Puero, who controlled the recordings, spoke to him after March 8th, he didn't tell anybody. He did not tell anybody. And I just feel they took a person who was acting lawfully and they turned him into a criminal by tricking him, by dirty tricks. And, frankly, I cite this. That sounds almost like an entrapment argument. I'm not sure what you're doing. Well, they started asking him for a list of names of things. If we look at this Dobet case, which I cited in my reply brief, it talks about the fact that not everybody knows what a regulation forbids. And here we're not talking about lawyers. We're talking about doctors. And this sort of goes to the third argument, too, the Barassi argument. You know, Barassi, you're talking about millions. Here you're talking about peanuts. No doctor, no lawyer is going to risk his license for a couple thousand dollars a month. You never know, I have to say, Mr. Clavelli. I've seen some strange cases over the years. You probably have, too. I prosecuted a few people who did that. I'm sorry, Judge. I said I prosecuted a few people who did that. Yes, but I'll bet the underlying theory was because they were politicians who were. . . No, most of them were millionaire doctors, but go ahead. Well, you know, Your Honor, do I have to really say in this court that everyone knows doctors are the world's worst businessmen? So thank you so much. We'll forgive you, or your clients will forgive you for saying that. Thank you, Mr. Clavelli. Mr. Wallach. Good morning, Your Honors, and may it please the Court. My name is Brian Wallach, and I represent the United States government. The evidence in this trial was more than sufficient to support the district court's verdict. In our briefs, we set out that evidence at length. There was witness testimony, records, recordings, and as the court has mentioned in its prior discussion with defense counsel, the defendant's post-dress statement. And I think based on where the court was with its initial questions, the government would like to start by focusing on those recordings. I think those recordings are what are central in this case. As the district court found, this is about the defendant's knowledge and intent. And here we have direct evidence of the statements that were made by the defendant in the month leading up to the check that was charged in Count 49, as well as on the actual day of his receipt of that check. And so looking at those recordings, it makes clear that the defendant himself knew that he was being paid by Sacred Heart for his patient referrals, knew this was a quid pro quo. The first recording takes place on February 18, 2013, and that's a phone call between the defendant and Anthony Perreault. At that time, Anthony Perreault was cooperating with the government, but the defendant, of course, did not know this. The defendant is the one who picked up the phone and made that phone call. And the reason for that phone call was because the defendant had not received his monthly check from Sacred Heart. Is this when they start going through that dance about whether he has to come in and get it in person versus get it through the mail? That's correct, Your Honor. And in that dance, the defendant says, I received it by mail for years. Perreault then informs him that Novak had asked Perreault to hand deliver the check to the defendant. And in response to this change, the defendant, on his own, without any prompting from Mr. Perreault, says, I've done, quote, 7 cases at Sacred Heart last month, meaning January 2013. Again, without prompting, he then offers to give Mr. Perreault a list of patients if Novak wants to see that list. So is there any reason why that isn't really just a sense of saying, look, I've had this long-term contract with you. I do all these procedures over there. The medical residents and students can observe them. And it's just a sign of my involvement. Where do we get from involvement to quid pro quo out of those calls? And I think the jump is, Your Honor, if you look back at the contracts here, if you look back at what he was purportedly being paid for, he was purportedly being paid to be the director of external podiatric rotations. Well, this is one with a multiple title or multiple people with the same title. Exactly. That was a position that had been filled twice over, including by someone who was not being paid by Sacred Heart. In addition, there was that set of responsibilities that were set out. And as the district court found, it was abundantly clear from the evidence that Dr. Morshiri didn't perform the vast majority of those responsibilities. But he is doing something. I mean, the procedures are real. Correct. And the procedures are real, and the procedures were done at Sacred Heart because that's what brings in the billings. That's what his job was, as he described it in one of the recordings with Mr. Perot. And I think the jump here is made clear by the subsequent conversations. When there is a withholding of the check, the first thing he mentions is his patience. It's not his teaching of the students. It's not the residency program. And, indeed, in all of these recordings, the residency program does not come up once. The residents do not come up once. Teaching does not come up once. Instead, the second recording that I wanted to mention is the February 22 recording. This is that first in-person meeting between Mr. Perot and Dr. Morshiri. And at the start of that meeting, what happens? Mr. Perot gives Dr. Morshiri his check, and Dr. Morshiri hands over the list of patients to him. Dr. Morshiri then explains that that list is the name of patients that have been done here in the last month, not these are the individuals that I used to help teach the students. These are the patients that I've done here in the last month. Mr. Perot then asks if these surgeries were surgeries that were performed at Sacred Heart Hospital. Dr. Morshiri then confirms, yes, these were all done at Sacred Heart Hospital. They were all done in January 2013. Perot says, I will give this list to Mr. Novak. Dr. Morshiri then says, I don't have to come and shake. I come and do my job. I leave. That job, the tie here is the receipt of that check. The receipt of that check is associated with the patients that he's bringing to Sacred Heart Hospital. And that connection, that quid pro quo, I think, becomes even more clear when you look at the final in-person conversation that is recorded here. That is on March 8, 2013. That's actually the date of the receipt of the check that is charged in Count 49. And in that conversation, Perot says that he gave the list to Novak. And in that moment, he hands Dr. Morshiri a second check, so another check from Sacred Heart Hospital. And Dr. Morshiri asks, what did Novak say, referring to the list that had been handed up. Perot then says, you don't want me to tell you. And asks him whether or not he has. So that's actually a lie, right? I mean, Novak didn't say what Perot said Novak said. Correct. He did not give a full recitation of what the conversation was. I think that's accurate to say. But that does not become the sort of epicenter here. What ends up happening is he then asks again, did Novak like or not like the list? And Mr. Perot says, you know him better. What does he say? And that's where, as the Court alluded to earlier, there's the Taj Mahal reference. And I think that full conversation is actually important. Because he says, Novak wants the Taj Mahal, all or nothing. He then goes on to say, he, meaning Novak, should be very happy I bring my patients here. This is not the first stop for me. It's in that context that he then describes himself as the most active podiatrist in the Department of Podiatry at Sacred Heart Hospital. So we have to say that the jury is then allowed to infer from that. He isn't quite saying, and I'm going to stop doing it if you stop giving me the checks. I mean, that's what you want the jury to do. That's what would make it illegal, right? And I think that's where his statement later on in that conversation, where he says, you know, I can get you a list of all my activity. It's very impressive. And then he says, I don't want to go anywhere else because I like you. I like it here. I like it here. That's what Judge Cannelli paraphrased. Exactly. And I'll bet you anywhere else they like me. That is, to the court's point, that is the threat. That is the, you are changing the program up on me. We've had this program in place for a very long time. I bet you anywhere else would like me. And why would they like me? Because of my patients, not because of my teaching in the residency program. Again, that's not mentioned at any point here. And I think to the court's point earlier, when you look at the defendant's post-dress statement, you know that this is a quid pro quo because he says that. And defense counsel said there's no recording, but there are notes. There was testimony. Special Agent Jamrose was cross-examined by defense counsel at length on this issue. And what came out of that. So he admits, I mean, he orally admits. It's not part of the written statement. Correct. This is what Judge Cannelli says, that the contract with the hospital at some point turned into payments for patient referrals. Correct. But that is reflected in the contemporaneous notes that were taken by the agent on that day. And that, I think, is a significant point, that he makes a number of admissions. He initially says, yes, I've been working at Sacred Heart for a while. Yes, I've been paid by Sacred Heart. He calls his payments a stipend. But he admits that he was paid by Sacred Heart, this quote, stipend, regardless of how many hours he actually taught. Meaning he could teach zero hours, he gets paid the stipend. He is then asked whether or not the stipend was nothing more than payments for patients. And that's when he says, yes, you know, he admits, my contract turned into paying for patients. Those were the words that were written down at that point in time by the agent. I mean, I suppose ordinarily, you know, a doctor is doing a procedure at a hospital, and the person who gets billed for the cost of that procedure is the patient, you know, or the insurance or Medicare or Medicaid or somebody. It's not the hospital that pays the doctor to perform the procedure there. Correct. Some other consumer, so to speak, is who gets the bill. Correct, and I think that's where. And the hospital will actually send a separate bill usually. I mean, they find all sorts of creative ways to bill people, but they would perhaps send a separate bill also to the patient. To the patient, to the insurance company, yes. And I think that's where, as the point mentioned earlier, and this is the second point that was raised by defense counsel, Dr. Petroff's testimony, combined with the testimony of numerous other podiatrists who were part of the Podiatric Residency Program, that they weren't paid. So do you have a cumho tire theory for Dr. Petroff, you know, just experience? Because he doesn't really do any kind of survey on what these, on the price level for people with these titles would be. Correct. And I think I'd point, as we cited in our brief, to Allen, to Medavente, to Panzer, in which the court has said you do not have to be monolithic in terms of the admission of opinion expert testimony. It can be based on those surveys. It can be based upon, you know, a full statistical analysis, or in each of those cases there was opinion testimony that was admitted based upon the special and considerable experience of the expert. That's what I'm saying. That's essentially what cumho tire says is at the Supreme Court level is acceptable, and your view would be the right. I mean, he's cross-examined about all of this, right? Correct. So that would go to the weight. Correct, and I think that most of the arguments set forth by the defendant in their brief go to the weight the court should record it. I think the critical piece here is that before letting in the testimony that was objected to, that foundational objection, the district court went through and performed its gatekeeping function. It actually made the government go back, laid the foundation for that specific knowledge, and as was set forth in our brief, that was based upon 20 years' worth of work, 60 on-site visits, discussion during those visits, plus, as Dr. Petrava testified earlier, his own experience running residency programs, his own experience running the Council on Podiatric Medical Education, his involvement in numerous boards, and his involvement in practicing podiatry for years. Now, did the government bring out he says he's done all of these things, which I gathered from Mr. Clavelli's argument that this might not have been in cities as big as Chicago or in places with that kind of price structure? Do we know where he was going? There was no testimony about specifically where he went to, but this is an individual who ran the entire council that oversees the podiatric medical programs in the United States. Nationally? Correct. Okay. And that was his responsibility, and part of his responsibilities within there was serving on this on-site evaluation program. Those are the evaluations that the defendant mentions multiple times in his brief that took place in the glass one in 2006, so well prior to the events that we're talking about here in 2013. And Dr. Petrava, in that foundation that was laid and in his testimony, did not simply offer the baseline statement, the Ipsy Dixit, if you will, that the courts have prohibited. Instead, there was a clear explanation of the bases for his opinion, and there also was a clear, as the court indicated, chance to cross-examine him about multiple opinions, to call into question, as the court pointed out, do you know the Chicago market? Is there a difference between these two? The testimony, however, was that the most that Dr. Petrava had heard of was $4,000 per year. Here there was payments of $4,000 per month. That is a significant difference between the two, and the court was permitted to, and I think appropriately drew the inference, that that shows that the payments here were not for his teaching in the podiatric residency program. They were for something else, for his patients. The final point here, and defense counsel, I think, mentioned this, is the Barassi piece. And I know this was something the court heard about in the prior argument, so I will not belabor the point too much. But here we have an economic regulation that does not threaten any constitutionally protected rights. The CNTR requirement is a significant requirement. The district court's decision here, I think, appropriately demonstrated that. As the court mentioned, he was acquitted on two counts and convicted on the third. So any vagueness in the statute, as this court and other courts have previously held, is more than rectified by that significant CNTR requirement. We're not talking about the government being able to walk in after the fact and convict anyone. The government has to show knowledge and willfulness, which was what was required here. And all this court did in Barassi was align itself with every other circuit who has been asked to consider the language of the anti-kickback statute. This is not an extreme interpretation by any stretch of the imagination. Instead, it's a recognition that reflects the text of that statute, nothing more and nothing less. So what do you think the primary evil, this came up in these briefs, of paying for referrals is? I believe that the statutory history, and I think it's been borne out in the case law, was that there is generally an understanding or a belief that the patient interest should be the driver of patient care. When you have payments to doctors to convince them to bring a patient to a specific hospital, that inverts that typical question. So it's essentially conflict of interest based? I believe so. The doctor's thinking of what he's going to be paid as opposed to what the patient interest would be? Yeah, and I think it's appropriate to say the primary driver becomes the doctor's profits, not the patient's health. And that is the concern that always takes place in these cases, and that underlies all these cases. And in some cases it's graver than others, but as a general matter, when you have something that steps in the middle of that relationship, we place a significant amount of trust in doctors, all professionals in this country, but in particular doctors, to do the right thing and to do the right thing by their patient. When that's destroyed and you end up in a situation where the doctor is looking towards their bottom line, that has significant ramifications, and that is one of the reasons why the anti-kickback statute was enacted. There's a panoply of others, but I see I'm almost out of time. So if the court has no further questions, the United States would respectfully request that this court affirm the defendant's conviction and sentence in this case. All right, thank you very much. Anything further, Mr. Clavelli? Your Honor, I'm just going to summarize in about one minute. The anti-kickback statute applied too strictly towards people like my client who want to be lawful members of society into potential criminals. That's the problem. It's too vague. You have to be sharp to realize you've crossed the line and to pay for play because, as the district judge pointed out, every contract, every relationship between a doctor and a hospital involves patient care. And there's no unnecessary operations here. So I want to once again say he's going along lawfully until Mr. Poirot says, and I say that he suggested, we need a list. We don't think you're doing enough. The boss is dissatisfied. And then, of course, Agent Jamrose engages him in conversation. We don't know how the conversation went, but he writes the word stipend in his statement. You can't read it. It's illegible because he's a doctor. So on the eighth to the last entry on three pages of notes, which is an appendix to my brief, you see stipend, you know, and then after that, the third to the last entry is the turned into pay for play. So you know that conversation was the very last thing. Agent Jamrose stopped the two-hour interview, whatever it was, when he finally got what he wanted. So my client is an honest man, and he says, you know, maybe they were more interested in my patients than my teaching. My teaching, I don't know. So he's an honest man, and now his license is suspended, and he's a felon. That's not right, Judge. And it's ultimately because of the way the statute has been interpreted too broadly. That is my suggestion to the court. Well, thank you very much, and thank you for accepting this appointment. The court appreciates it very much. Thanks as well to the United States. We will take this case under advisement.